## Batton's Adoption.

*Adoption—Consent of parents and relatives—Fraud—Act of May 28, 1915.*
1. A decree of adoption under the Act of May 28, 1915, P. L. 580, with the consent of the child's parents, will not be subsequently vacated upon the ground that the child's uncle and aunt, in whose custody the child had been placed by its father, had not been notified of the presentation of the petition.
2. The act contains no provision for notice to relatives who may have been caring for the child at the request of its parents.
3. A father who is unable to support his child and places it in the custody of his sister and her husband, suitable persons to have charge of it, does not thereby abandon the child within the meaning of the act.

Rule to show cause why decree of adoption should not be vacated. C. P. No. 2, Phila. Co., Dec. T., 1922, No. 10528.

*T. O. Haydock*, for petitioners; *Wm. B. S. Ferguson*, contra.

GORDON, J., May 8, 1923.—This case is before us on a petition and rule to show cause why a decree of adoption heretofore entered should not be vacated.

On March 10, 1923, Mr. and Mrs. Edwin A. Geipel, citizens and residents of Philadelphia, presented their petition to this court for the adoption of Thomas Batton, a minor, three years old. The petition was in proper form, and contained attached to it the written consent of the father and mother of the minor. Shortly after the entry of the decree, the petition now before us was presented. It is by Mr. and Mrs. Thomas J. Williams, the uncle-in-law and aunt respectively of the minor, and is also signed by Ennis M. Batton, the father. The petition prays for the vacation of the decree, and sets forth as the basis of the prayer that the decree was secured by fraud and in violation of the Act of Assembly of May 28, 1915, P. L. 580, relating to the adoption of minors. The contention of the petitioners is: First, that the aunt and uncle-in-law, who had the actual custody of the minor, were not notified of the presentation of the petition, that they were entitled to such notice under the Act of 1915, and that the decree should be vacated for this reason; and, second, that the consent of the parents of the minor was secured by the adopt-

ing parents through false representations respecting the then condition of the child in the custody of the aunt, and the inability of the aunt and uncle-in-law to support it. It is earnestly contended by counsel for the petitioners that the evidence shows that the mother and father of the child had abandoned it and neglected to support it, and that the aunt, who was actually supporting the child at the time of the adoption, was, because of this fact, entitled to notice of the proceedings, and that the adoption could not lawfully be had without the consent of the aunt.

We cannot agree with these contentions of the petitioners. The evidence discloses that the child's father, who lives in Chester, Pa., and its mother, who is divorced from the father, and who has remarried and is living in Baltimore, were unable personally to support it, and that the father brought the child to its aunt, Mrs. Williams, and entrusted it to her care. In the case of Booth v. Van Allen, 7 Phila. 401, it was held that a mother and father, who had placed their child in the care of a suitable person—a sister of the father—could not be held to have abandoned or neglected the child. Poverty, or the inability to personally maintain and care for a child, is not the criterion of abandonment and neglect or refusal to provide for it. The Act of 1915 provides, *inter alia*, that the . . . "Court, if satisfied that the welfare of such child will be promoted by such adoption, may, with the consent of the parents, or surviving parent, of such child; or, if the father or mother, from drunkenness, profligacy or other cause, shall have neglected or refused to provide for his or her child or children for the period of one year or upwards, proven to the court, with the consent of the non-neglecting father or mother alone; or, if none, of the next friend of such child, or the guardians or overseers of the poor, or of such charitable institution as shall have supported such child for at least one year, decree," etc.

It is evident that the intention of the act was to provide for the securing of consent to an adoption of an abandoned child by the guardians of the poor or such charitable institutions as shall have supported it. There is no provision in the act for notice to relatives who may have been caring for a child at the request of its parents, and, except in the contingency already referred to, the consent of the parents alone is required for an adoption.

The boy in this case was not abandoned by its parents. It is true they were unable themselves personally to care for it, but they made suitable and adequate provision for its care by placing it in the custody of its aunt. Their right, therefore, to adopt the child out to a suitable person or persons remained in them, and we find no irregularity in the proceedings by which the decree in this case was originally secured.

It may be noted at this point that the evidence shows that the father gave a paper to the aunt sometime before the child was introduced to the Geipels for the purpose of adoption, in which he authorized the aunt to adopt the child out to a suitable person. This paper had no legal effect, and conferred upon the aunt no right beyond possibly that of consenting to an adoption in the absence of the father. The best that can be said for the paper is that it may be considered a power of attorney, which, of course, is revocable at the will of the person executing it, and in this case it was revoked by the personal consent of both the father and mother. The paper, therefore, has no significance in the case.

The second ground upon which the revocation of the decree is asked is that the father and mother are alleged to have been deceived by fraudulent representations made to them by Mr. and Mrs. Geipel at the time their consent to

the adoption was secured. These alleged fraudulent representations relate to the inability of Mr. and Mrs. Williams properly to maintain the child. We have carefully considered the evidence upon this subject, and are satisfied that no fraudulent representations were made. In the absence of such representations, the decree cannot be disturbed; for the parents have not the power, by changing their minds, to destroy the status brought about by a decree entered upon their own consent. In the matter of Helen Frances Young's Adoption, 259 Pa. 573, the Supreme Court held: "By adoption, a new status was created, which cannot be stricken down because of regret of the parent who consented thereto." Unless, therefore, the parents were imposed upon and deceived, and induced to consent to an adoption which they would not otherwise have consented to, they cannot be heard to protest the entry of the decree.

The evidence shows that some time in the end of December, 1922, or the early part of January, 1923, Mrs. Williams told Mrs. Mary Jane Fleck, who is the proprietress of a boarding-house at which the Williamses boarded, that she was desirous of placing the child, Thomas Batton, in a suitable family for adoption. Mr. and Mrs. Geipel were acquainted with Mrs. Fleck, and through her the Geipels and the Williamses were brought together. The Geipels were eager to adopt a child, and, after seeing Thomas, they expressed their willingness and desire to adopt him. With the consent of Mrs. Williams, they took Thomas into their home, where he became ill with pneumonia, and was nursed successfully through that illness by them. Mr. and Mrs. Geipel became attached to the boy, and Mrs. Williams agreed, after investigating their character, standing and reputation, to secure the consent of the father to the adoption. At that time, Mrs. Williams informed the Geipels that the mother of the boy was dead, and they caused papers for adoption to be drawn based upon these representations. These papers were shown to Mrs. Williams, who was satisfied and consented at that time to the proceedings. Shortly thereafter, Mrs. Williams went to the Geipels' house and took the child away, and informed Mr. and Mrs. Geipel that the father would not consent to the adoption. When asked for the reason, she refused to give any. Not satisfied with this situation, Mr. Geipel went to see the father in Chester, Pa., from whom he learned that the mother was living in Baltimore. The Geipels then opened negotiations to secure the consent of both parents independently of Mrs. Williams, the aunt. These negotiations took place in the presence of an alderman of Chester, a Mr. Lowrie. It was evident that Mr. Batton entertained some fear of his sister, and, under her domination, had refused to sign the papers originally submitted to him. After one or two interviews with Mr. Geipel, Mr. Batton finally consented to the adoption and signed the written consent attached to the original petition in this case. Mrs. Batton, now Mrs. Gustavason, was seen by Mrs. Geipel in Baltimore and gave her written consent to the adoption. The parents were produced by the petitioners at the hearing and testified to statements alleged to have been made by Mr. and Mrs. Geipel, respectively, concerning the financial condition of the Williamses and their inability properly to maintain the boy. Certain of the statements alleged to have been made by Mr. and Mrs. Geipel are denied by them, and the court believes the denial. The Geipels gave their version of the conversations which were had with the parents, and Mr. Geipel's version of his conversation with the father was corroborated and supplemented by the testimony of the alderman, a disinterested person. It may be observed, in the first place, that whether the statements alleged as the basis of the false representations were true or not was a matter that the parents themselves could

have easily verified by communicating with Mrs. Williams. In the second place, giving them their full value as false representations, it is doubtful whether the parents would have been justified in withholding, or would have withheld, their consent to this adoption had they believed the situation to have been other than as represented. The court does not believe much of the testimony of the parents of the child which relates to the conversations had with the Geipels, and, in so far as it is contradicted by the latter, the court adopts their version as the correct one.

It will be observed that this is not a case of parents seeking to revoke an adoption in order that they may themselves regain possession of their child. The moving party in the matter is the aunt, whose dominion over the father is evident. She testified that the only reasons for her changing her mind and withdrawing her formerly given consent to the adoption were three in number. She said she had stipulated that she should retain her relationship to the boy, and that the Geipels agreed to this, but subsequently repudiated this agreement. This is not an accurate statement of the understanding. Of course, a blood relative does not lose relationship by reason of adoption. In addition, the Geipels testified, and the court believes, that the only modification of this agreement, if such it can be called, was that they should be allowed to have the child for a short period alone, in order to gain its confidence and affection and establish themselves in its eyes as its parents. This was not an unreasonable requirement, and we have no doubt that Mr. and Mrs. Geipel will bear in mind the proper interest of its relatives in the child. The second reason that Mrs. Williams gave for changing her mind was that, upon one occasion, Mr. Geipel told her he had sown many wild oats in his youth. This objection is without weight, in view of the fact that the petitioners admit the Geipels are decent and proper persons to adopt the child, that their home is suitable and that their influence on the child would be good. The third and last reason given by Mrs. Williams for changing her mind was the statement by her that he (Mr. Geipel) "has absolutely no religion to anchor to. He said this earth was his heaven and his religion was being good to his fellowmen, and a child of Thomas's temperament has a right to have a parent who will look after his religion." Beyond this statement of a conclusion, no evidence whatsoever was presented to the court to show that, from the standpoint of religion or religious observance, the Geipels were improper persons to have the care and custody of this minor. One witness testified that the Geipels attended church, and all agreed that they are decent, upright and proper persons to have the custody and care of the child. The evidence does not disclose the religion of the child's parents, and, beyond the foregoing generality, no objection to the adoption on a religious ground was presented.

In conclusion, it may be observed that had the evidence touching upon the suitability of the petitioners and the question as to whether the welfare of the child would be promoted by the adoption, which has been taken under this rule, been heard by us under the original petition, our action would have been the same.

The policy of the law in these matters makes the child's welfare the primary consideration. It is no reflection upon Mr. and Mrs. Williams to point out that from the worldly and financial standpoint, the evidence indicates that the child's welfare would be as well, if not better, promoted by the adoption. Mrs. Williams's affection for her brother's child is taken for granted, but we are constrained to believe that the child's best interests are conserved by declining to vacate this decree.

The rule to show cause is, therefore, discharged.